UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
3:09-cv-387-RJC-DCK

| | |
|---|---|
| UNITED STATES COMMODITY FUTURES TRADING COMMISSION, <br>      Plaintiff, <br><br> v. <br><br> CAPITALSTREET FINANCIAL, LLC & SEAN F. MESCALL, <br>      Defendants, and <br><br> GERALD T. MESCALL & GAINCAPITAL, INC., <br>      Relief Defendants. | ORDER |

FINDINGS OF FACT, CONCLUSIONS OF LAW AND
ORDER OF FINAL JUDGMENT,
PERMANENT INJUNCTION, CIVIL
PENALTIES AND OTHER EQUITABLE RELIEF

This matter is before the Court on Plaintiff U.S. Commodity Futures Trading

Commission's ("CFTC" or "Commission") Motion for Default Judgment, Permanent Injunction,

Civil Penalties and Other Equitable Relief ("Default Motion").  (Dkt. No. 84).  For the reasons

stated below, the Default Motion is **GRANTED** in part and **DENIED without prejudice** in part.

I.      SUMMARY

The CFTC filed this action against defendants Sean F. Mescall ("Mescall") and

Capitalstreet Financial, LLC ("Capitalstreet" and, together with Mescall, "Defendants") on

September 9, 2009, alleging that Defendants operated a "Ponzi" scheme involving the trading of

leveraged off-exchange foreign currency ("forex" or "foreign currency") and charging them with

violating the anti-fraud provisions of the Commodity Exchange Act ("the Act"), 7 U.S.C. §§ 1, et

seq. (2006), as amended by the Food, Conservation, and Energy Act of 2008, Pub. L. No.

110-246, Title XIII (the CFTC Reauthorization Act of 2008 ("CRA")) §§ 13101-13204, 122 Stat. 1651 (enacted June 18, 2008). The Complaint also named Gerald T. Mescall ("G. Mescall") and Gaincapital, Inc. ("Gaincapital") as Relief Defendants, alleging that they had received a portion of Defendants' ill-gotten gains. The Complaint further alleged that Mescall is liable for the violations of Capitalstreet pursuant to Section 13(b) of the Act, 7 U.S.C. §13c(b) (2006), because, as a controlling person, he knowingly induced the violations or failed to act in good faith. Finally, the Complaint alleged that Capitalstreet is liable pursuant to Section 2(a)(1)(B) of the Act and Commission Regulation ("Regulation") 1.2, 7 U.S.C. §2(a)(1)(B) and 17 C.F.R. §1.2 (2011), as a principal for its agent's violations of the Act.

On September 10 and 16, 2009, Defendants and Relief Defendants were properly served with the Complaint. Defendants and Relief Defendants failed to appear or answer the Complaint within the time permitted by FED. R. CIV. P. 12(a)(1). Accordingly, on November 3, 2009, the Clerk of this Court entered a default as to Defendants and Relief Defendants. Defendants and Relief Defendants have not sought to set aside their default, have not attempted to dispute or defend against the allegations in the Complaint, and have not otherwise appeared in this action, excluding Mescall's limited appearance at the May 24, 2010 show cause hearing with respect to Plaintiff's Motion to hold Defendant Mescall in contempt.

The Court has considered the Complaint, the factual allegations of which are well-pleaded and hereby taken as true, the memorandum the Commission filed in support of its Default Motion and the exhibits thereto, and, being fully advised and familiar with the record in this matter, hereby enters findings of fact and conclusions of law, and hereby issues a final order of permanent injunction, that also provides for restitution, a civil monetary penalty and ancillary equitable relief pursuant to Section 6c of the Act, 7 U.S.C. § 13a-1 (2006), as set forth herein.

**II.     FINDINGS OF FACT**

   A.     The Parties

   Plaintiff Commodity Futures Trading Commission is an independent federal regulatory agency of the United States empowered by Congress to enforce the provisions of the Act, 7 U.S.C. §§ 1 et seq., and the Regulations, 17 C.F.R. §§ 1.1. et seq.  The Commission maintains its principal office at Three Lafayette Centre, 1155 21st Street, N.W., Washington, D.C. 20581.

   Defendant Capitalstreet was at all relevant times a Nevada limited liability company. Capitalstreet's principal place of business was 4605 River Hills Drive, Denver, North Carolina, 28037.  It was engaged in the business of soliciting and accepting funds for purportedly operating and trading managed accounts and/or a pooled investment in connection with agreements, contracts or transactions in off-exchange forex that were margined or leveraged.

   Defendant Sean F. Mescall resided at all relevant times in Denver, North Carolina. Mescall formed Capitalstreet on August 25, 2006.  Mescall, through Capitalstreet, was engaged in the business of soliciting and accepting funds for purportedly operating and trading managed accounts and/or a pooled investment in connection with agreements, contracts or transactions in off-exchange forex that were margined or leveraged.  During the relevant period, apart from Capitalstreet, Mescall had no other employment or source of income.  Mescall was the President, owner and manager of Capitalstreet during the relevant period.  Mescall had virtually complete authority over, and day-to-day control of Capitalstreet; he did not report to anyone or share authority with anyone.

   Relief Defendant Gerald Mescall is Defendant Sean Mescall's father.  At all relevant times, he resided with his son in Denver, North Carolina.

   Relief Defendant Gaincapital was a corporation organized under the laws of Delaware.

3

Defendant Mescall formed Gaincapital on March 27, 2009. Mescall was the sole shareholder of Gaincapital and was its President and its only corporate director. Mescall exclusively had complete control and authority over Gaincapital. At all relevant times, Gaincapital's address and principal place of business was Mescall's residence in Denver, North Carolina.

      B.    <u>Defendants Fraudulently Solicited Customers to Trade Forex</u>

Throughout the relevant period, Defendants fraudulently solicited, directly and through others, 97 individuals for the purported purpose of trading forex. Defendants, directly and through others, represented to these customers that they would trade foreign currency for them. Mescall solicited customers himself through phone calls and in-person solicitations. Mescall also directed the solicitations of others. Defendants falsely claimed experience and success in trading foreign currency. They lured prospective customers with false promises that they could quickly make large profits, such as 60 to 80 percent per year.

Capitalstreet maintained a website, www.capitalstreetfinancial.com. The website stated that Capitalstreet offered "forex managed accounts," that were "for the investor who prefers to have his capital managed by professionals." The website also stated that Capitalstreet launched operations in 1999 and it listed over 35 offices across two states, New York and North Carolina. However, Capitalstreet was not formed until 2006, and, during the relevant period, it operated from, at most, four locations in and around Charlotte, North Carolina. Indeed, even Mescall's own sworn testimony contradicts these claims. He testified that he was a stockbroker until mid-2006, that his last position was with Brookstreet Securities, and that he formed Capitalstreet in 2006.

Consistent with this pattern of mendacity, Defendants failed to disclose to customers and prospective customers that their claims of experience and success in trading forex were false.

4

Defendants failed to disclose that there was no basis for their representation that customers could quickly earn enormous investment returns. Defendants further failed to disclose that they were operating a Ponzi scheme and misappropriating customer funds. Customers and prospective customers relied on Defendants' representations and omissions in making their decisions to invest and reinvest with Defendants.

C.    Defendants Traded Only Some Customer Funds and Lost Those Funds Trading

Only 26 of Defendants' 97 customers had actual trading accounts where Defendants traded forex on their behalf. Defendants lost virtually all of the funds they attempted to trade for these customers. The remainder of Defendants' customers, as detailed in the next section immediately below, did not even have trading accounts; Defendants simply misappropriated their funds and never attempted to trade forex for them.

With respect to those 26 customers that had actual trading accounts, in late August 2006 Defendants opened several trading accounts in Capitalstreet's name at GAIN Capital Group, Ltd. ("GAIN Capital"), a futures commission merchant ("FCM") registered with the CFTC that has no relation to Mescall's corporate shell misleadingly named Gaincapital. These accounts included a proprietary trading account, as well as accounts for trading customer funds. Twenty-six of Capitalstreet's customers sent some or all of their investment funds directly to GAIN Capital (or sent checks to Defendants that were made payable to GAIN Capital) for Capitalstreet to trade forex on their behalf in their individual accounts. The 26 customers transferred a collective total of $275,908 into their separate individual trading accounts in this manner. These customers also executed standardized agreements provided by GAIN Capital that authorized Capitalstreet to trade forex on their behalf. Contrary to their representations, Defendants were not successful foreign currency traders. In fact, the opposite was true, and

5

Defendants were singularly inept forex traders. They sustained devastating trading losses in their customers' individual managed trading accounts at GAIN Capital, losing nearly all of the customer funds that they attempted to trade, some $270,332.

> D.   Defendants Misappropriated More Than $1.3 Million of Customer Funds

For the remaining Capitalstreet customers, unbeknownst to them, Defendants did not even attempt to trade forex with their funds. Defendants instead misappropriated their funds as soon as they received them. For the most part, Defendants told customers to send their investment funds directly to Capitalstreet, either by check payable to Capitalstreet or wire transfer to Capitalstreet's corporate bank accounts. During the relevant period, Capitalstreet maintained two corporate bank accounts and Mescall was a signatory on both accounts. Relief Defendant G. Mescall also was a signatory on both Capitalstreet accounts. Customers sent a total of $1,345,529 directly to Defendants by check or wire transfer, all of which was deposited into the Capitalstreet bank accounts. Defendants used only a minuscule portion of those funds, some $10,000, for forex trading. Defendants misappropriated the remainder of the customers' funds, totaling $1,344,145. Defendants used a portion of the misappropriated funds to return $289,532 of purported principal and profits to some Capitalstreet customers, in the manner of a Ponzi scheme.

The vast majority of the misappropriated customer funds, $1,055,997, went to pay for Mescall's living expenses and those of his father, Relief Defendant G. Mescall, as well as the operation of Capitalstreet. Specifically, during much of the relevant period, Mescall and his father used the two Capitalstreet corporate bank accounts as their own personal accounts, paying virtually all of their household and personal expenses from these accounts. These expenses included:

- mortgage and home equity loans on their home in affluent Lake Norman (G. Mescall was the obligor on the mortgage and loans);

- lease payments for a Toyota Tundra pickup truck and a Toyota Avalon sedan, and the purchase of both a BMW and a Ferrari by Mescall, as well as insurance for all these automobiles;

- monthly payments on a speedboat, as well as marina fees for docking the boat on Lake Norman and expenses related to maintenance and upkeep of the boat;

- a trip to Las Vegas, Nevada, including a stay at the luxurious MGM Grand Hotel;

- a transfer of $50,000 to Mescall's off-shore entity, Patrick Fitzgerald Financial, Inc. in the Republic of Cyprus;

- large cash withdrawals, totaling $90,000;

- approximately $110,000 of gold and silver coins and bullion;

- jewelry, including a Rolex watch and diamonds;

- a variety of expenses related to their residence, including utilities, homeowners association fees and satellite television, as well as expenses related to the maintenance and upkeep of the house and grounds;

- a variety of personal expenses, including groceries, merchandise, restaurants, retail stores and pharmacies; and

- individual health insurance.

G. Mescall was not entitled to the use and benefit of funds that customers entrusted to Capitalstreet for forex trading. He did not provide any legitimate services to Capitalstreet, nor did he have any claim to any Capitalstreet customer funds he received from Defendants.

E.   Relief Defendants Gerald Mescall and Gaincapital Received a Total of Approximately $118,000 of Misappropriated Funds

On April 27, 2009, Mescall started transferring customer funds from the Capitalstreet corporate bank accounts to the account of a newly-formed shell corporation, misleadingly named Gaincapital, that he owned and controlled. Gaincapital had a corporate bank account. Mescall

7

and G. Mescall were signatories on this account. Mescall and his father used Gaincapital's corporate bank account for many of the aforementioned personal and household expenses. Gaincapital did not provide any legitimate services to Capitalstreet and it did not have any legitimate entitlement to any Capitalstreet customer funds it received from Defendants. G. Mescall did not provide any legitimate services to Gaincapital, Inc., and he, therefore, did not have any legitimate entitlement to the customer funds in its bank account. Between April 27 and September 3, 2009, Mescall transferred $38,200 from Capitalstreet's bank accounts to the Gaincapital bank account. G. Mescall made some deposits into the Gaincapital bank account, but the vast majority of funds in that account came from Capitalstreet's bank accounts. Relief Defendant G. Mescall withdrew or received the use and benefit of a combined total of $198,006 from the Capitalstreet bank accounts and the Gaincapital bank account. G. Mescall contributed $112,431 to the three accounts, including his monthly social security payment, a monthly pension, and occasional payments from other sources. The expenditures from these accounts attributable to G. Mescall exceeded his deposits by $85,575, which means that he received the use and benefit of $85,575 that rightfully belongs to the innocent customers who entrusted those funds to Capitalstreet for forex trading.

      F.    <u>Defendants Concealed the Trading Losses and Misappropriation With False Statements</u>

Defendants, through false representations and statements by Mescall and Capitalstreet, directly and through others, concealed their misappropriation, their unsuccessful trading, and their on-going fraud through oral and written communications that Defendants were actually and profitably trading forex on behalf of customers. Defendants provided false monthly account statements to Capitalstreet customers showing consistent profitable returns. Relying on the

8

consistently profitable monthly account statements, certain existing customers invested

additional funds with Defendants. Defendants' fraudulent scheme began to unravel when, in

January and February 2009, certain Capitalstreet customers requested that Defendants return

their funds, but Defendants did not return their money.

## III.   CONCLUSIONS OF LAW

### A.   Jurisdiction and Venue

This Court has jurisdiction over this action pursuant to Section 6c of the Act, 7 U.S.C. §

13a-1 (2006), which provides, in relevant part, that whenever it shall appear to the Commission

that any person has engaged, is engaging or is about to engage in any act or practice constituting

a violation of any provision of the Act, the Commission may bring an action against such person

to enjoin such practice or to enforce compliance with the Act.  This Court has personal

jurisdiction over the Defendants and Relief Defendants, all of whom reside and can be found in

this District.  Venue properly lies with this Court pursuant to Section 6c(e) of the Act, 7 U.S.C. §

13a-1(e) (2006), in that Defendants are found in, inhabit, or transact business in this District,

and/or the acts and practices in violation of the Act and Regulations have occurred, are

occurring, or are about to occur within this District.

### B.   Defendants' and Relief Defendants' Failure to Answer Warrants Entry of Default Judgment

When a party against whom a default judgment is sought has failed to plead or otherwise

assert a defense, and that fact has been documented, the clerk shall enter the party's default.  FED.

R. CIV. P. 55(a).  The party seeking the default shall then apply to the court for a default

judgment.  FED. R. CIV. P. 55(b).

Entry of default judgment is left to the sound discretion of the trial court.  SEC v.

9

Lawbaugh, 359 F. Supp. 2d 418, 421 (D. Md. 2005) (granting default judgment for permanent injunction, disgorgement and a civil monetary penalty where defendant failed to answer complaint alleging securities fraud and misappropriation). While the Fourth Circuit has a strong policy that cases should ordinarily be decided on the merits, see United States v. Shaffer Equip. Co., 11 F.3d 450, 462 (4th Cir. 1993), default judgment is appropriate when the adversary process has been halted because of an unresponsive party. Lawbaugh, 359 F. Supp. 2d at 421 (citing Jackson v. Beech, 636 F.2d 831, 836 (D.C. Cir. 1980)).

Upon default, the well-pled allegations in the complaint are to be taken as true for purposes of establishing liability. Lawbaugh, 359 F. Supp. 2d at 422; see also Holland v. New Country Mining, Inc., No. 01:06-0626, 2006 U.S. Dist. LEXIS 88372, at *6 (S.D. W.Va. Dec. 6, 2006) (where defendant has not pled or otherwise defended himself in an action, all averments in the complaint are deemed admitted); Ryan v. Homecomings Fin. Network, 253 F.3d 778, 780 (4th Cir. 2001) (defaulting defendant admits plaintiff's well-pled allegations of fact). Defendants and Relief Defendants have not responded to the Complaint, have not attempted to dispute or defend against the allegations in the Complaint, and have not otherwise appeared in this action, apart from Mescall's limited appearance at the May 24, 2010 show cause hearing with respect to Plaintiff's Motion for Contempt against Mescall. Accordingly, entry of final judgment by default against Defendants and Relief Defendants is wholly appropriate in this case.

C.    Defendants Violated Section 4b(a)(2)(A)-(C) of the Act

Section 4b(a)(2) of the Act, as amended by the CRA, makes it unlawful:

for any person, in or in connection with any order to make, or the making of, any contract of sale of any commodity for future delivery, or other agreement, contract, or transaction subject to paragraphs (1) and (2) of section 5a(g), that is made, or to be made, for or on behalf of, or with, any other person, other than on or subject to the rules of a designated contract market -

10

(A) to cheat or defraud or attempt to cheat or defraud the other person;

(B) willfully to make or cause to be made to the other person any false report or statement or willfully to enter or cause to be entered for the other person any false record; [or]

(C) willfully to deceive or attempt to deceive the other person by any means whatsoever in regard to any order or contract or the disposition or execution of any order or contract, or in regard to any act of agency performed, with respect to any order or contract for or, in the case of paragraph (2), with the other person . . .

7 U.S.C. § 6b(a)(2). Through their misrepresentations and omissions of material fact, misappropriation, and issuance of false account statements, the factual details of which are set forth above, the Court concludes that Defendants violated Section 4b(a)(2)(A)-(C) of the Act, as amended by the CRA.

### 1.  **Fraud by Misrepresentations and Omissions**

To establish that Defendants violated Section 4b(a)(2)(A), (C) of the Act, as amended by the CRA, the Commission must prove that (1) a misrepresentation, misleading statement, or deceptive omission was made; (2) with scienter; and (3) that the misrepresentation, misleading statement, or deceptive omission was material. CFTC v. King, No. 3:06-CV-1583-M, 2007 WL 1321762, at *2 (N.D. Tex. May 7, 2007) (citing CFTC v. R.J. Fitzgerald & Co., 310 F. 3d 1321, 1328 (11th Cir. 2002)). As shown below, the Commission has demonstrated that Defendants - through their misrepresentations and deceptive omissions of material fact - violated Section 4b(a)(2)(A), (C) of the Act, as amended by the CRA.

### a.  Defendants Made Misrepresentations and Omissions

Defendants knowingly misrepresented to customers, among other things, that: (1) they were experienced in trading forex; (2) they had been successful in trading forex; (3) they could earn large profits with returns such as 60 to 80 percent per year for customers by trading forex;

11

and (4) they had profitably traded forex on behalf of customers, as reported on the false account statements they delivered to customers.  Defendants also created the false impression of being a well-established forex trading firm by falsely claiming to be in operation since 1999 and having over 35 offices in New York and North Carolina.

In actuality, only $285,908 of the $1,621,437 that  Defendants solicited from customers to trade forex was actually used to trade forex.  Defendants failed to disclose that they lost virtually all of the funds they attempted to trade.  Defendants failed to disclose that the vast majority of the funds that customers entrusted to Capitalstreet were not used for trading, but instead were misappropriated by Defendants.  Defendants failed to disclose that any purported profits and returns on investments remitted to Capitalstreet customers came from either existing Capitalstreet customers' original investments or money invested by subsequent Capitalstreet customers.  Finally, Defendants failed to disclose that they were operating a Ponzi scheme in which they misappropriated $1,344,145 from their customers.

        b.    <u>Defendants Acted With Scienter</u>

The scienter element is established when an individual's "conduct involves intentional omissions or misrepresentations that present a risk of misleading customers, either known to the defendant or sufficiently manifest that the defendant must have been aware of the risk." <u>King</u>, 2007 WL 1321762, at *2 (citing <u>R.J. Fitzgerald & Co.</u>, 310 F. 3d at 1328) (internal quotation marks omitted); <u>Wasnick v. Refco, Inc.</u>, 911 F.2d. 345, 348 (9th Cir. 1990) (holding that scienter is established when an individual's acts are performed "with knowledge of their nature and character") (citation omitted); <u>Lawrence v. CFTC</u>, 759 F. 2d 767, 773 (9th Cir. 1985) (providing that Commission must demonstrate only that a defendant's actions were "intentional as opposed to accidental").  "Recklessness is [also] sufficient to satisfy Section 4b's scienter reuirement."

12

<u>Drexel Burnham Lambert, Inc. v. CFTC</u>, 850 F.2d 742, 748 (D.C. Cir. 1988).

Defendants, through the acts of Mescall, made misrepresentations and omissions to Capitalstreet customers with the requisite scienter. When Defendants, through Mescall, made oral representations and issued written statements to Capitalstreet customers regarding forex trading and the purported profitable returns, Defendants, through Mescall, clearly knew such representations and statements were false. Defendants knew they were not successfully trading forex. They knew that they were using customer funds to pay purported profits and return principal to other customers, using them to fund Capitalstreet's operations, and using them for Mescall's personal and household expenses and those of his father. Accordingly, the Defendants acted with the requisite scienter.

c.  <u>Defendants' Misrepresentations and Omissions Were Material</u>

A statement is material if "there is a substantial likelihood that a reasonable investor would consider the information important in making a decision to invest." <u>R&W Technical Serv. Ltd. v. CFTC</u>, 205 F.3d 165, 169 (5th Cir. 2000); <u>see</u> <u>R.J. Fitzgerald & Co.</u>, 310 F.3d at 1328 ("A representation or omission is material if a reasonable investor would consider it important in deciding whether to make an investment") (citing <u>Affiliated Ute Citizens of Utah v. United States</u>, 406 U.S. 128 (1972) (internal quotation marks omitted)). Any fact that enables customers to assess independently the risk inherent in their investment and the likelihood of profit is a material fact. <u>In re Commodities Int'l Corp.</u>, [1996-1998 Transfer Binder] Comm. Fut. L. Rep. (CCH) 26,943, 1997 CFTC LEXIS 8, at *25 (CFTC Jan. 14, 1997); <u>see also</u> <u>Saxe v. E.F. Hutton & Co., Inc.</u>, 789 F.2d 105, 110 (2d Cir. 1986) ("'[M]aterial misrepresentations about the nature of the organization handling [an] account, the people [dealt] with, and the type of trading [the] funds were used for' would be sufficient to state a cause of action pursuant to the

13

[Act].") (citing <u>Psimenos v. E.F. Hutton & Co. Inc.</u>, 722 F.2d 1041, 1043-44 & n.5 (2d Cir. 1983)).

Defendants' misrepresentations and omissions are material in that a reasonable customer would want to know, among other things, that the Defendants were not the experienced and successful forex "professionals" they claimed to be, but instead were unsuccessful in trading forex, were relatively inexperienced in trading forex, and, moreover, any purported returns on investment were being paid using other Capitalstreet customers' money as part of a Ponzi scheme.

### 2. **Fraud by Misappropriation**

Defendants violated Section 4b(a)(2)(A), (C) of the Act, as amended by the CRA, by misappropriating customer funds. Mescall used the vast majority of the customer funds for his own personal and household expenses and those of his father, G. Mescall, including: the mortgage and home equity loans on their residence in Lake Norman; several automobiles, including a BMW and a Ferrari; jewelry and gold and silver coins and bullion; a speedboat; a trip to Las Vegas, Nevada; and the entire spectrum of normal, everyday personal and household expenses. Mescall used a portion of the misappropriated funds to finance Capitalstreet's ongoing operations. Mescall used $289,532 of the misappropriated funds to meet redemption requests by customers of Capitalstreet, in the manner of a Ponzi scheme. Finally, as discussed above, the Relief Defendants also received a potion of the misappropriated funds and received the use and benefit of those funds.

Misappropriation of customer funds constitutes "willful and blatant" fraud in violation of Section 4b(a)(2)(A), (C) of the Act, as amended by the CRA. <u>CFTC v. Noble Wealth Data Info. Servs.</u>, Inc., 90 F. Supp. 2d 676, 687 (D. Md. 2000) (finding that defendants misappropriated

14

customer funds by diverting such funds for operating expenses and personal use, in violation of Section 4b(a)(2)(i), (iii) of the Act (the predecessor to 4b(a)(2)(A), (C) of the Act)), aff'd sub nom. CFTC v. Baragosh, 278 F.3d 319 (4th Cir. 2002); see also CFTC v. Skorupskas, 605 F. Supp. 923, 932 (E.D. Mich. 1985) (holding that defendant violated Section 4b when she misappropriated pool participant funds by soliciting funds for trading and by trading only a small percentage of those funds, while disbursing the rest of the funds to other investors, herself, and her family); CFTC v. Weinberg, 287 F. Supp. 2d. 1100, 1106 (C.D. Cal. 2003) (finding that defendant misappropriated customer funds entrusted to him for trading purposes, in violation of Section 4b(a)(2)(i), (iii) of the Act); In re Slusser, [1998-1999 Transfer Binder] Comm. Fut. L. Rep. (CCH) 27,701, 1999 WL 507574, at *12 (CFTC July 19, 1999) (holding that respondents violated Section 4b of the Act by surreptitiously retaining money in their own bank accounts that should have been traded on behalf of participants), aff'd in relevant part sub nom. Slusser v. CFTC, 210 F.3d 783 (7th Cir. 2000); King, 2007 WL 1321762, at *2 ("King's violation of section 4b(a)(2)(i), (iii) of the [Act] is further proven by his admitted misappropriation of customer funds for personal and professional use.") (citation omitted); CFTC v. McLaurin, [1994-1996 Transfer Binder] Comm. Fut. L. Rep. (CCH) 26,768, 1996 U.S. Dist. LEXIS 9417, at *9-10 (N.D. Ill. 1996) (concluding that defendant misappropriated customer funds by depositing those funds in accounts in which the customers had no ownership interest and by making unauthorized disbursements for his own use, in violation of Section 4b(i) of the Act).

3.    **Fraud by Issuing False Account Statements to Customers**

Defendants violated Section 4b(a)(2)(B) of the Act, as amended by the CRA by providing false account statements to customers that misrepresented the value of their trading accounts and the profitability of Capitalstreet's trading. Specifically, the Defendants provided

15

monthly account statements that falsely represented that, based on Defendants' profitable forex trading, customers had earned profits each month.

Delivering, or causing the delivery of, false account statements to customers is a violation of Section 4b(a)(2)(B) of the Act, as amended by the CRA.  See, e.g., Noble Wealth, 90 F. Supp. 2d. at 685-87 (finding that defendants violated Section 4b(a)(i)-(iii) of the Act because they delivered false account statements, in addition to having engaged in other violative misconduct); CFTC v. Sorkin, [1982-1984 Transfer Binder] Comm. Fut. L. Rep. (CCH) 21,855, at 27,585 (S.D.N.Y. August 25, 1983) (determining that distribution of false account statements which falsely report trading activity or equity is a violation of Sections 4b(B) and 4o the Act).

### D.   Mescall Is Liable Pursuant to Section 13(b) of the Act for Capitalstreet's Violations of the Act

Mescall is liable for Capitalstreet's violations of the Act pursuant to Section 13(b) of the Act, 7 U.S.C. § 13c(b), because, as a controlling person,  he knowingly induced the violations or failed to act in good faith.  "[A] fundamental purpose of [S]ection 13(b) is to allow the Commission to reach behind the corporate entity to the controlling individuals of the corporation and to impose liability for violations of the Act directly on such individuals as well as on the corporation itself."  In re JCC, Inc., [1992-1994 Transfer Binder] Comm. Fut. L. Rep. (CCH) 26,080, 1994 CFTC LEXIS 140, at *2, 33-42 (CFTC May 12, 1994) (finding principals of company liable because they were officers of corporation who were involved in monitoring sales activities), aff'd sub nom. JCC, Inc. v. CFTC, 63 F.3d 1557 (11th Cir. 1995).

To demonstrate controlling person liability under Section 13(b), the Division must show (1) control, and (2) lack of good faith or knowing inducement of the acts constituting the violation.  In re First Nat'l Trading Corp., [1992-1994 Transfer Binder] Comm. Fut. L. Rep.

16

(CCH) 26,142, 1994 CFTC LEXIS 216, at *32 (CFTC July 20, 1994), aff'd without opinion sub

nom. Pick v. CFTC, 99 F.3d 1139 (6th Cir. 1996). To establish control, the Commission must

prove that a defendant possesses general control over the operation of the entity principally

liable. R.J. Fitzgerald, 310 F.3d at 1334; see also Apache Trading Corp., [1990-1992 Transfer

Binder] Comm. Fut. L. Rep. (CCH) 25,251 at 38,795 (CFTC Mar. 11, 1992) (finding that an

individual controls a corporation where he "directs the economic aspects of the firm"); In re

Spiegel, [1987-1990 Transfer Binder] Comm. Fut. L. Rep. (CCH) 24,103 at 34,767 (CFTC Jan.

12, 1988) (finding that evidence that a defendant is an officer, founder, principal and the

authorized signatory on the company's bank accounts indicates the power to control a company).

To establish the "knowing inducement" element under Section 13(b) of the Act, the

Commission must show that the "the controlling person had actual or constructive knowledge of

the core activities that constitute the violation at issue and allowed them to continue." CFTC v.

Johnson, 408 F. Supp. 2d 259, 269 (S.D. Tex. 2005) (quoting JCC, Inc. v. CFTC, 63 F.3d 1557,

1568 (11th Cir. 1995)). Controlling persons cannot avoid liability by consciously avoiding

knowledge about potential wrongdoing. In re Spiegel, [1987-1990 Transfer Binder] Comm. Fut.

L. Rep. (CCH) 24,103, 1988 CFTC LEXIS 10, at *23, n.11 (CFTC Jan. 12, 1988). Indeed,

constructive knowledge of wrongdoing is sufficient for a finding of knowing inducement. See

JCC, Inc., 63 F.3d at 1568. To support a finding of constructive knowledge, the Commission

must show that a defendant "lacked actual knowledge only because he consciously avoided it."

Id. at 1569 (citations omitted).

Mescall is liable for Capitalstreet's violations pursuant to Section 13(b). First, he

controlled Capitalstreet. At all relevant times, Mescall was the President, Owner and Manager

of Capitalstreet. Mescall solicited and interacted with Capitalstreet customers and prospective

17

customers.  Mescall also directed or authorized other individuals employed by Capitalstreet to

solicit and interact with Capitalstreet customers and prospective customers.  Mescall also was a

signatory on the two Capitalstreet bank accounts used in the Ponzi scheme.  Second, Mescall

knowingly induced the acts constituting the violations.  As explained above, he not only knew of

the fraud being perpetrated by Capitalstreet, he ran the fraudulent operation.  Given Mescall's

control of Capitalstreet and knowing inducement  of the fraud, he is liable for Capitalstreet's

violations of the Act.

> E.     Capitalstreet is Liable Under Section 2(a)(1)(B) of the Act and Regulation 1.2
>        for the Violations of the Act Committed by Its Agents

Mescall committed the acts and omissions described herein within the course and scope

of his employment, agency or office at Capitalstreet.  Capitalstreet, therefore, is liable under

Section 2(a)(1)(B) of the Act and Regulation 1.2 as a principal for its agent's violations of the

Act.  7 U.S.C. § 2(a)(1)(B); 17 C.F.R. § 1.2 (2010).

> F.     Relief Defendants Are Not Entitled to Ill-Gotten Gains

"Federal courts may order equitable relief against a person who is not accused of

wrongdoing" where that person: "(1) has received ill-gotten funds; and (2) does not have a

legitimate claim to those funds." CFTC v. Kimberlyn Creek Ranch, 276 F.3d 187, 191-192 (4th

Cir. 2002) (citing SEC v. Cavanagh, 155 F.3d 129, 136 (2d Cir. 1998)); SEC v. George, 426

F.3d 786, 798 (6th Cir. 2005) (same).  As set forth below, G. Mescall and Gaincapital each

received ill-gotten funds from Mescall and Capitalstreet to which they did not have a legitimate

claim.

Relief Defendant Gaincapital was a shell corporation controlled by Mescall.  It

maintained a bank account at Peoples Bank.  Both Mescall and G. Mescall were signatories on

that account, and both of them used that account to pay all manner of personal expenses. Mescall transferred $38,200 of customer funds from Capitalstreet's corporate bank accounts to Gaincapital's account. The vast majority of funds in the Gaincapital account came from Capitalstreet. By receiving funds from Capitalstreet, Gaincapital thus received funds from Defendants that were derived from their fraudulent acts and has been unjustly enriched thereby. Relief Defendant Gaincapital did not provide any legitimate services to Capitalstreet and did not have any legitimate claim to any of Capitalstreet's funds. Accordingly, Relief Defendant Gaincapital must disgorge $38,200 of ill-gotten gains it received.

Relief Defendant G. Mescall also received Capitalstreet customer funds from Defendants and from Relief Defendant Gaincapital totaling $85,575. G. Mescall did not provide any legitimate services to Capitalstreet and, therefore, does not have any legitimate claim to any of the funds in Capitalstreet's bank accounts, apart from those he deposited. G. Mescall was a signatory on Capitalstreet's two bank accounts and on the Gaincapital bank account. G. Mescall paid for his personal expenses using funds from these three accounts, either by writing checks, using debit cards or withdrawing cash. Apart from his deposits of personal funds totaling $112,431 into the three bank accounts, G. Mescall did not have any interest in or entitlement to the remaining funds in those accounts, which consisted of funds that customers entrusted to Capitalstreet for forex trading. G. Mescall's contributions to the three accounts, however, were insufficient to cover the $198,006 of personal and household expenditures from these accounts that are attributable to him. The $85,575 difference between his personal deposits into the three accounts and his withdrawals constitutes ill-gotten gains, funds that have benefited and enriched G. Mescall at the expense of Capitalstreet's victims. Accordingly, the Relief Defendant G. Mescall must disgorge $85,575 of ill-gotten gains he received.

19

G.    Statutory and Equitable Relief are Appropriate Remedies in CFTC Enforcement
      Actions

The Commission has requested that the Court enter an Order that: permanently enjoins

Defendants from committing further violations of the Act and Regulations as charged and from

engaging in any commodity-trading-related activity; requires that Defendants make restitution to

the customers they defrauded; requires that Relief Defendants disgorge the customer funds they

received from the Defendants; and imposes a civil monetary penalty ("CMP") against

Defendants.

The Commission's request is well-received.  First, Section 6c of the Act, 7 U.S.C. §

13a-1, authorizes the Commission to seek permanent injunctive relief and CMPs, stating in

relevant part:

> (a) Whenever it shall appear to the Commission that any registered entity or other
> person has engaged, is engaging, or is about to engage in any act or practice
> constituting a violation of any provision of this Act or any rule, regulation or
> order, thereunder . . . the Commission may bring an action in the proper district
> court of the United States . . . to enjoin such act or practice, or to enforce
> compliance with this Act, or any rule, regulation or order thereunder . . .

> (d) . . . the Commission may seek and the court shall have jurisdiction to impose,
> on a proper showing, on any person found in the action to have committed any
> violation . . . a civil penalty in the amount of not more than the greater of
> $100,000 or triple the monetary gain to the person for each violation . . .

7 U.S.C. § 13a-1.  Second, as explained below, restitution and disgorgement are ancillary

equitable relief within the power of the district court to grant, and they are appropriate remedies

for violations of the Act.  See, e.g., Co. Petro Marketing Group, Inc., 680 F.2d 573, 583-84 (9th

Cir. 1982).

H.    A Permanent Injunction Against the Defendants is Warranted

The Commission must show only two things to obtain permanent injunctive relief in an

action under Section 6c of the Act, 7 U.S.C. § 13a-1: (1) that a violation of the Act has occurred; and (2) that there is a reasonable likelihood of future violations. See CFTC v. Hunt, 591 F.2d 1211, 1220 (7th Cir. 1979), cert. denied 442 U.S. 921 (1979) (finding that "[o]nce a violation is demonstrated, the moving party need show only that there is some reasonable likelihood of future violations" under Section 6c of the Act). To be sure, while past misconduct does not require the conclusion that there is a likelihood of future misconduct, it is "highly suggestive of the likelihood of future violations." CFTC v. Hunt, 591 F.2d 1211, 1220; see also CFTC v. Am. Metals Exch. Corp., 693 F. Supp. 168, 191 (D.N.J. 1988) ("The likelihood of future violations may be inferred from past infractions based upon consideration of the totality of the circumstances to determine if the past infraction was an isolated occurrence as opposed to an indication of a systematic and continuous pattern of wrongdoing") (citation omitted); cf. SEC v. Zale Corp., 650 F.2d 718, 720 (5th Cir. 1981) ("[T]he [Securities and Exchange] Commission is entitled to prevail when the inferences flowing from the defendant's prior illegal conduct, viewed in light of the present circumstances, betoken a 'reasonable likelihood' of future transgressions"), cert. denied, 454 U.S. 1124 (1981) (citations omitted); Hunt, 591 F.2d, at 1219-20 (reversing the district court's denial of injunctive relief, and stating that a court of appeals should not hesitate "to reverse an order denying [injunctive] relief when it is evident that the trial court's discretion has not been exercised to effectuate the manifest objectives of the specific legislation involved.") (internal quotation marks and citation omitted). Further, this Court's May 25, 2010 Order of Contempt as to Mescall is further evidence of the likelihood of future violations by the Defendants. (Dkt. No. 51).

In contrast with other civil litigation, in an action for permanent injunctive relief, the Commission is not required to make a specific showing of irreparable injury or inadequacy of

other remedies which private litigants must make. <u>CFTC v. Muller</u>, 570 F.2d 1296, 1300 (5th Cir. 1978); <u>CFTC v. British Am. Commodity Options Corp.</u>, 560 F.2d 135, 141-42 (2d Cir. 1977) (same), cert. denied, 438 U.S. 905 (1978); <u>United States v. Quadro Corp.</u>, 928 F. Supp. 688, 697 (E.D. Tex. 1996) ("[T]he government need [not] prove 'irreparable harm' which is the standard in almost all common law injunction determinations"), <u>aff'd</u>, 127 F.3d 34 (5th Cir, 1997) (citation omitted). Additionally, because enforcement proceedings under Section 6c of the Act, 7 U.S.C. §13a-1, involve the public interest rather than a private controversy, the equitable jurisdiction of the district court is not to be denied or limited in the absence of a clear legislative command. <u>Hunt</u>, 591 F.2d at 1222-23 (citing <u>Porter v. Warner Holding Co.</u>, 328 U.S. 395, 398 (1946)). In such a proceeding, the court's equitable powers are broader and more flexible than in private controversies. <u>Hunt</u>, 591 F.2d at 1223 (citing <u>Porter v. Warner Holding Co.</u>, 328 U.S. at 398).

The egregious, systematic and widespread nature of Defendants' fraudulent conduct warrants imposition of a permanent injunction against them. Accordingly, as specified in the Order below, Mescall and Capitalstreet are permanently restrained, enjoined and prohibited from further violations of the Act and Regulations as charged in the Complaint and from certain commodity-related activities, including but not limited to trading, solicitation and seeking registration.

        I.      <u>Restitution and Disgorgement</u>

           1.      **Restitution and Disgorgement Are Appropriate Equitable Remedies in Commission Enforcement Actions**

As discussed above, Section 6c of the Act, 7 U.S.C. § 13a-1, authorizes the Commission to bring an action to enjoin violations of, and enforce compliance with the Act. In a civil

enforcement action brought pursuant to Section 6c, the district court may order ancillary equitable relief that it deems appropriate, including restitution and disgorgement. CFTC v. Kimberlynn Creek Ranch, Inc., 276 F.3d 187, 193 (4th Cir. 2002) ("it is well settled that equitable remedies such as disgorgement are available to remedy violations of the [Act]"); United States v. Universal Mgmt. Servs., Inc., 191 F.3d 750, 760-61 (6th Cir. 1999) ("[r]estitution and disgorgement are part of the court's traditional equitable authority"); Co. Petro, 680 F.2d at 582-84 ("unless a statute specifically or by inescapable inference commands the contrary, we are not to deny the inherent equitable powers of a court to afford complete relief").

### 2. **Restitution by Defendants**

The object of restitution is to restore the status quo and return the parties to the positions they occupied before the transactions at issue occurred. Porter v. Warner Holding Co., 328 U.S. 395, 402 (1946) (equitable restitution consists of "restoring the status quo and ordering the return of that which rightfully belongs to the purchaser or tenant"); United States v. Long, 537 F.2d 1151, 1153 (4th Cir. 1975) (restitution consists of restoring the injured party "to the position he formerly occupied either by the return of something which he formerly had or by the receipt of its equivalent in money") (quoting Restatement of Restitution, § 1, Comment: a, at 12 (1937)); see also SEC v. AMX Int'l, Inc., 7 F.3d 71, 74-75 (5th Cir. 1993) ("[r]estitution . . . has the goal of making the aggrieved party whole"); First Penn Corp. v. FDIC, 793 F2d 270, 272 (10th Cir. 1986) ("[t]he object of restitution is to return the parties to the position that existed before the transaction occurred").

"Restitution is measured by the amount invested by customers less any refunds made by the [D]efendants." Noble Wealth, 90 F. Supp. 2d at 693; see also CFTC v. Marquis Fin. Mgmt.

Systems, Inc., 2005 WL 3752232, at *6 (E.D. Mich. 2005) (ordering restitution in the amount of net customer deposits); Rosenberg, 85 F. Supp. 2d at 455 (ordering restitution in amount of customer deposits). But see CFTC v. Wilshire Inv. Mgmt. Corp., 531 F.3d 1339, 1343-45 (11th Cir. 2008) (holding in a case involving fraudulent solicitation only, that the proper measure of restitution is the defendant's unjust enrichment).

Defendants solicited $1,621,437 from customers. Of the total funds solicited, customers received back or otherwise recovered $295,118. However, three customers received payments from Capitalstreet in excess of their deposits; the total of the excess payments to these three customers is $12,509. The difference between the amount Defendants solicited ($1,621,437) and the amount customers received back from Defendants or otherwise recovered (excluding the three customers who received a total of $12,509 of overpayments from Capitalstreet) is $1,338,828. The court-appointed temporary-receiver distributed approximately $265,468 to Defendants' customers in connection with this case (Receiver's Motion to Make Distribution of Assets and to Establish Distribution Amounts (Dkt.No. 71)), which means Defendants owe $1,073,360 of restitution. Mucha Dec. 20. Accordingly, as set forth in the Order below, the Defendants shall jointly and severally make restitution to Capitalstreet's customers in the amount of $1,073,360, plus post-judgment interest.

3. **Disgorgement by Relief Defendants**

The Relief Defendants are not charged with violations of the Act, but equitable relief as to them is appropriate because they received ill-gotten funds, and they do not have a legitimate claim to those funds. Kimberlyn Creek Ranch, 276 F.3d at 191-93 (affirming the district court order freezing the assets of the relief defendants to preserve those assets for subsequent disgorgement); SEC v. George, 426 F.3d at 798-800 (affirming the district court order of

24

disgorgement as to the relief defendants). Relief Defendant G. Mescall received a net amount of $85,575 in ill-gotten gains over the course of Defendants' fraud, funds he withdrew or funds spent for his benefit from the bank accounts of Defendant Capitalstreet and Relief Defendant Gaincapital in excess of his contributions to those accounts. Accordingly, as set forth in the Order below, G. Mescall shall disgorge $85,575 in ill-gotten gains, plus post-judgment interest. Relief Defendant Gaincapital received $38,200 of ill-gotten gains during Defendants' fraud. Accordingly, as set forth in the Order below, Gaincapital shall disgorge $38,200 in ill-gotten gains, plus post-judgment interest.

    4.    **Post-Judgment Administration of Restitution and Disgorgement**

The court-appointed temporary receiver has liquidated the available assets of the Defendants and Relief Defendants; disbursed the proceeds to Capitalstreet's customers; and has been dismissed from this action. Receiver's Motion for Approval of Final Receiver's Report and Accounting and Dismissal of the Receiver (Dkt.No. 79), pp. 1-2; Order, dated April 19, 2011 (Dkt.No. 82) (dismissing the Receiver). CFTC asks the Court to appoint the National Futures Association ("NFA") as Monitor to administer the post-judgment restitution and disgorgement discussed above, including the receipt, accounting, administration, and payment of all post-judgment restitution and disgorgement monies paid by Defendants and Relief Defendants. The NFA is one of the independent self-regulatory organizations that together regulate the futures industry in the United States as authorized by the Act. See www.nfa.futures.org. Specifically, NFA regulates firms and individuals that engage in futures trading with public customers. Id. As delegated by the Commission, it also performs the registration functions of the Commission. See 17 C.F.R. § 3.2(a) (2011).

CFTC has not, however, provided the Court with any authority showing that this Court

may force the NFA to perform any administrative duties on behalf of the Court or the Commission.  Therefore, the Court declines to appoint the NFA.  The Court makes no ruling as to the Commission's authority to delegate its administrative duties to the NFA itself.  The Commission's Default Motion, (Dkt. No. 84), is **DENIED without prejudice** on this point.

J.    Civil Monetary Penalty

Section 6c(d)(1) of the Act provides "the Commission may seek and the Court shall have jurisdiction to impose . . . on any person found in the action to have committed any violation . . . a civil penalty in the amount of not more than the greater of $100,000 or triple the monetary gain to the person for each violation."  7 U.S.C. §13a-1(d)(1).  The Commission Regulations adjust the statutory civil monetary penalty of $100,000 for inflation.  17 C.F.R. § 143.8.  For the period at issue here, the statutory civil monetary penalty was $130,000 per violation (for violations committed prior to October 23, 2008) and $140,000 per violation (for violations committed thereafter).  Id.

The Court is free to fashion a civil monetary penalty appropriate to the gravity of the offense and sufficient to act as a deterrent.  Miller v. CFTC, 197 F.3d 1227, 1236 (9th Cir. 1999).  "In determining how extensive the fine for violations of the Act ought to be, courts and the Commission have focused upon the nature of the violations."  Noble Wealth, 90 F. Supp. 2d at 694.  Conduct that violates the core provisions of the Act, such as customer fraud, should be considered extremely serious.  JCC, Inc. v. CFTC, 63 F.3d 1557, 1571 (11th Cir. 1995).  In JCC, Inc., the U.S. Court of Appeals for the Eleventh Circuit upheld the district court order imposing a civil monetary penalty, finding that "[c]onduct that violates the core provisions of the Act's regulatory system - such as manipulating prices or defrauding customers should be considered very serious even if there are mitigating facts and circumstances."  Id. at 1571 (internal quotation

26

marks and citation omitted) (emphasis added). In the case at hand, there are no mitigating facts or circumstances. Instead, Mescall was blatant and malicious in his fraudulent conduct, enriching himself to the tune of $1,055,997 at the expense of his 97 innocent victims.

In light of the conduct discussed above, the Court concludes that a serious and significant sanction is appropriate. Accordingly, Defendants shall pay, jointly and severally, a civil monetary penalty of "triple the monetary gain to the person for each violation" pursuant to Section 6c(d)(1). See CFTC v. Hayes, 2007 WL 858772 at *5 (E.D. Va. Mar. 13, 2007) (imposing penalty of triple the monetary gain); CFTC v. Premium Income Corp., 2007 WL 429092 at *14 (N.D. Tex. Jan. 26, 2007) (imposing penalty of triple the monetary gain, "as measured by triple the amount of customer funds received by [defendants], less the funds returned to customers, plus pre-judgment interest"). Defendants profited $1,055,997 by virtue of their fraud. Three times that amount is $3,167,991, which again is an appropriate penalty given the gravity of Defendants' offenses.

## IV.    ORDER

**IT IS, THEREFORE, ORDERED** that:

<u>PERMANENT INJUNCTION</u>

1.      Defendants Sean F. Mescall and Capitalstreet Financial, LLC are permanently restrained, enjoined and prohibited from:

> A.      further violations of Section 4b(a)(2) of the Act, as amended by the CRA and the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 ("Dodd-Frank Act"), Pub. L. No. 111-203, title VII (the Wall Street Transparency and Accountability Act of 2010), §§ 701-774, 124 Stat. 1376 (enacted July 21, 2010), to be codified at 7 U.S.C. § 6b(a)(2);
>
> B.      trading on or subject to the rules of any registered entity, as that term is defined in Section 1a of the Act, as amended by the CRA and the Dodd-Frank Act, to be codified at 7 U.S.C. § 1a, for his own personal

27

account, for any account in which he has a direct interest or indirect interest, or for any other account for or on behalf of any other person or entity, whether by power of attorney or otherwise;

C.      entering into any transactions involving commodity futures, options on commodity futures, commodity options (as that term is defined in Regulation 32.1(b)(1), 17 C.F.R. § 32.1(b)(1) (2011)) ("commodity options"), and/or foreign currency (as described in Sections 2(c)(2)(B) and/or 2(c)(2)(C)(i) of the Act, as amended by the CRA, to be codified in 7 U.S.C. §§ 2(c)(2)(B) and/or 2(c)(2)(C)(i)) ("forex contracts") for their own personal account or for any account in which they have a direct or indirect interest;

D.      having any commodity futures, options on commodity futures, commodity options, and/or forex contracts traded on their behalf;

E.      controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity futures, options on commodity futures, commodity options, and/or forex contracts;

F.      soliciting, receiving or accepting any funds from any person for the purpose of purchasing or selling any commodity futures, options on commodity futures, commodity options, and/or forex contracts;

G.      applying for registration or claiming exemption from registration with the CFTC in any capacity, and engaging in any activity requiring such registration or exemption from registration with the Commission except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2011); and

H.      acting as a principal (as that term is defined in Regulation 3.1(a), 17 C.F.R. § 3.1(a) (2011)), agent, officer or employee of any person registered, required to be registered, or exempted from registration or with the Commission, except as provided for in Regulation 4.14(a)(9), 17 C.F.R. § 4.14(a)(9) (2011).

<u>RESTITUTION</u>

2.      Defendants Sean F. Mescall and Capitalstreet Financial, LLC shall pay, jointly and severally, restitution in the amount of $1,073,360, plus post-judgment interest (the "Restitution Obligation"), subject to the offset provisions of paragraph 4 immediately below. Post-judgment interest on the Restitution Obligation shall accrue commencing on the date of the

28

entry of this Order and shall be determined using the Treasury Bill rate prevailing on the date of the entry of this Order pursuant to 28 U.S.C. § 1961.

## DISGORGEMENT

3.     Relief Defendants Gerald T. Mescall and Gaincapital, Inc. shall disgorge the ill-gotten gains they received from the Defendants, plus post-judgment interest (the "Disgorgement Obligations").  Relief Defendant Gerald T. Mescall shall disgorge $85,575, plus post-judgment interest.  Relief Defendant Gaincapital, Inc. shall disgorge $38,200, plus post-judgment interest.  Any funds received in satisfaction of the Disgorgement Obligations shall offset the Restitution Obligation by an equivalent amount.  Post-judgment interest on the Disgorgement Obligations shall accrue commencing on the date of the entry of this Order and shall be determined using the Treasury Bill rate prevailing on the date of the entry of this Order pursuant to 28 U.S.C. § 1961.

## CIVIL MONETARY PENALTY

4.     Defendants Sean F. Mescall and Capitalstreet Financial, LLC shall pay, jointly and severally, a civil monetary penalty in the amount of $3,167,991, plus post-judgment interest ("CMP Obligation").  Post-judgment interest on the CMP Obligation shall accrue commencing on the date of the entry of this Order and shall be determined using the Treasury Bill rate prevailing on the date of the entry of this Order pursuant to 28 U.S.C. § 1961.

5.     Defendants shall pay their CMP Obligation by electronic funds transfer, or U.S. postal money order, certified check, bank cashier's check, or bank money order.  If payment is to be made by other than electronic funds transfer, Defendants shall make payment payable to the Commodity Futures Trading Commission and deliver it the following address:

Case 3:09-cv-00387-RJC -DCK   Document 87   Filed 01/11/12   Page 29 of 33

Commodity Futures Trading Commission
Division of Enforcement
Attention: Linda Zurhorst-AMZ 341
DOT/FAA/MMAC
6500 South MacArthur Boulevard
Oklahoma City, OK 73169
Telephone: (405) 954-5644;

6.      If payment is to be made by electronic funds transfer, Defendants shall contact

Linda Zurhorst or her successor at the above address to receive payment instructions and shall

comply fully with those instructions. Defendants shall accompany the payment of the penalty

with a cover letter that identifies the paying Defendant and the name and docket number of the

proceeding. Defendants shall simultaneously transmit copies of the cover letter and the form of

payment to: (a) Director, Division of Enforcement, Commodity Futures Trading Commission,

Three Lafayette Centre, 1155 21st Street, N.W., Washington, D.C. 20581; and (b) Chief, Office

of Cooperative Enforcement, at the same address;

<u>MATTERS RELATED TO PAYMENTS OF RESTITUTION,
DISGORGEMENT AND CIVIL MONETARY PENALTIES</u>

7.      Defendants and Relief Defendants shall make their required restitution and

disgorgement payments under this Order in the name of the "Capitalstreet Settlement Fund" and

shall send such payments by electronic funds transfer, or U.S. postal money order, certified

check, bank cashier's check, or bank money order to the Commodity Futures Trading

Commission and deliver it the following address:

Commodity Futures Trading Commission
Division of Enforcement
Attention: Linda Zurhorst-AMZ 341
DOT/FAA/MMAC
6500 South MacArthur Boulevard
Oklahoma City, OK 73169
Telephone: (405) 954-5644

30

under a cover letter that identifies the paying Defendant or Relief Defendant and the name and docket number of the proceeding. The paying Defendant or Relief Defendant shall simultaneously transmit copies of the cover letter and the form of payment to: (a) Director, Division of Enforcement, Commodity Futures Trading Commission, Three Lafayette Centre, 1155 21st Street, N.W., Washington, D.C. 20581; and (b) Chief, Office of Cooperative Enforcement, at the same address.

8.      The Commission shall oversee Defendants' Restitution Obligation and Relief Defendants' Disgorgement Obligations, and shall have the discretion to determine the manner and timing of distribution of funds to Defendants' customers. The Commission shall distribute funds to the persons and entities on the Customer List on a pro rata basis, or in another appropriate equitable manner. Further, the Commission may, in its discretion, defer distribution until such time as it may deem appropriate. In the event the amount of restitution payments and/or disgorgement payments to the Commission are of a de minimus nature such that the Commission determines that the cost of making a distribution to customers is impractical, the Commission may, in its discretion, treat such restitution and/or disgorgement payments as civil monetary penalty payments;

9.      Defendants and Relief Defendants shall execute any documents necessary to release funds that they have in any repository, bank, investment or other financial institution wherever located, in order to make partial or total payment toward their respective Restitution Obligation and Disgorgement Obligations;

10.     To the extent that funds accrue to the U.S. Treasury as a result of the Restitution Obligation and/or Disgorgement Obligations, such funds shall be transferred to the Commission for disbursement in accordance with the procedures set forth in paragraphs 7 and 8 of this Order;

11.     All Payments by Defendants pursuant to this Order shall first be applied to satisfaction of the Restitution Obligation consistent with the authority granted the Commission above.  After satisfaction of the Restitution Obligation, payments by Defendants pursuant to this Order shall be applied to satisfy Defendants' CMP Obligation;

12.     Any acceptance by the Commission of partial payment from Defendants of their Restitution Obligation and/or CMP Obligation or from Relief Defendants of their Disgorgement Obligations shall not be deemed a waiver of Defendants' and/or Relief Defendants' obligations to make further payments pursuant to this Order, or a waiver of the Commission's and/or Monitor's right to seek to compel payment from Defendants and/or Relief Defendants of any remaining balance;

13.     Pursuant to FED. R. CIV. P. 71, customers of Defendants Sean F. Mescall and Capitalstreet Financial, LLC, as identified on the Customer List, are explicitly made intended third-party beneficiaries of this Order and may seek to enforce obedience with this Order to obtain satisfaction of any portion of the restitution and/or disgorgement that Defendants and/or Relief Defendants have not paid.  Nothing in this Order shall be construed in any way to limit or abridge the rights of any customer that exist under state or common law;

MISCELLANEOUS PROVISIONS

14.     Prohibition on Transfer of Funds:  Defendants shall not transfer or cause others to transfer funds or other property to the custody, possession or control of any other person or entity for the purpose of concealing such funds or property from the Court or the Commission until the Restitution Obligation and the CMP Obligation have been satisfied under this Order;

15.     Notices:  All notices required to be given by any provision in this Order shall be

32

sent by certified mail, return receipt requested, as follows:

|  |  |
|---|---|
| Notice to Commission: | Director |
|  | Division of Enforcement |
|  | Commodity Futures Trading Commission |
|  | Three Lafayette Centre |
|  | 1155 21st Street, NW |
|  | Washington, D.C. 20581 |

All such notices to the Commission shall reference the name and docket number of this proceeding; and

16.     The Commission's Default Motion, (Dkt. No. 84), is **GRANTED in part and DENIED without prejudice in part**.

Signed: January 11, 2012

Robert J. Conrad, Jr.
Chief United States District Judge

33